NATIONAL TRAILER CONVOY, INC.,
Plaintiff,
and
Morgan Drive-Away, Inc., and Transit
Homes, Inc., Intervening Plaintiffs,
v.
UNITED STATES of America and Inter-
state Commerce Commission,
Defendants,
and
Griffin Mobile Home Transporting Com-
pany, Intervening Defendant.

Civ. A. No. 5760.

United States District Court
N. D. Oklahoma.

March 20, 1964.

———◇———

Harold G. Hernly, Washington, D. C., Louis I. Dailey, Wrape & Hernly, Washington, D. C., and Memphis, Tenn., and J. C. Pinkerton, Pinkerton & Pinkerton, Tulsa, Okl., for plaintiff.

James E. Lesh, Lesow & Lesh, Indianapolis, Ind., and J. C. Pinkerton, Tulsa, Okl., for intervening plaintiffs.

William H. Orrick, Jr., Asst. Atty. Gen., Washington, D. C., John M. Imel, U. S. Atty., Tulsa, Okl., Lionel Kestenbaum and Michael I. Miller, Dept. of Justice, Washington, D. C., for defendant United States of America.

Robert W. Ginnane, Gen. Counsel, and Thomas H. Ploss, Washington, D. C., for defendant I. C. C.

W. T. Brunson and Charles D. Dudley, Oklahoma City, Okl., for intervening defendant.

Before BREITENSTEIN, Circuit Judge, and BOHANON and BARROW, District Judges.

BREITENSTEIN, Circuit Judge.

This action is to enjoin and set aside a report and order of the Interstate Commerce Commission (Commission) entered in its Docket No. MC–124190, Griffin Mobile Home Transporting Co., Contract Carrier Application.[1] Over the objection of the plaintiff and the intervening plaintiffs, herein referred to collectively as protestants, the Commission granted to intervening defendant, herein referred

---

1. The Commission report is published at 91 M.C.C. 801.

to as applicant, a permit authorizing interstate operation as a contract carrier, by motor vehicle over irregular routes, of house trailers between points in Oklahoma and points in 33 other states. The issue is whether the Commission erred in giving consideration to certain services offered by the applicant, desired by the shippers, and not supplied by the protesting common carriers.

The facts are not in dispute. Applicant proposes to assign a vehicle with driver to the exclusive use of each of five supporting shippers. Each driver will normally serve a single shipper. The drivers will set up the trailers at the point of destination, "a service which might entail blocking, unblocking, assembling dinette sets or other furniture, connecting electrical and plumbing services, making minor repairs, and expanding 'expando' trailers." [2]

The protestants, all common carriers, are authorized to serve the area, have suitable equipment, and will perform all the offered services except making repairs, connecting electrical and plumbing facilities, and preparing expandos. The excepted services are said to be of a nontransportation nature and not proper for consideration by the Commission in determining the right to the permit.

The services in question are variously referred to in the Commission report as "accessorial," "ancillary," "additional," and "personalized." The name to be given them is not important. For purposes of identification we shall refer to them as special services.

The examiner said that there was merit in the argument that "certain of the accessorial services to be performed by applicant exceeds those normally connected with transportation." He expressed the opinion that a service to meet

a shipper's distinct need "must involve services normal to the industry and incidental to transportation," and his recommendation was that the application be denied. The Commission accepted the examiner's findings of fact but rejected his recommendation.

In its report the Commission did not determine whether the special services were transportation or nontransportation in character. Instead it said [3] that the primary issue "concerns the weight to be accorded to these various services." The protestants contend that the special services may be given no weight because they relate to nontransportation activities. The applicant and the defendants argue that the special services must be given weight because they relate to the distinct needs of shippers but they carefully refrain from arguing that such services pertain to transportation. In this posture of the case we must determine whether in acting upon an application for a contract-carrier permit, the Commission may give consideration to nontransportation services needed by shippers and offered by applicants.

After the decision in United States v. Contract Steel Carriers, Inc., 350 U.S. 409, 76 S.Ct. 461, 100 L.Ed. 482, holding that a contract carrier did not become a common carrier because it reached for new business within the limits of its license, the Commission, concerned over the relationship between these two types of carriers, proposed amendments to the Act.[4] The purpose was to revise the definition of contract carrier and to cover related matters. Two of the 1957 amendments are pertinent here.

Section 203(a) (15) [5] which defines contract carrier, was amended to read:

"The term 'contract carrier by motor vehicle' means any person which engages in transportation by

---

2. 91 M.C.C. 802. An "expando" trailer can be expanded to larger dimensions at destination points or folded up for towing on the highway. A certain amount of training and specialization is needed to properly assemble and disassemble the "expando" trailers.

3. 91 M.C.C. 803.

4. See Interstate Commerce Commission v. J-T Transport Co., Inc., 368 U.S. 81, 85–86, 82 S.Ct. 204, 7 L.Ed.2d 147; and Senate Report No. 703, 85th Cong., 1st Session, U.S.Cong.News '57, pp. 1599, 1601, 1604.

5. 49 U.S.C. § 303(a) (15).

motor vehicle of passengers or property in interstate or foreign commerce, for compensation (other than transportation referred to in paragraph (14) of this subsection and the exception therein), under continuing contracts with one person or a limited number of persons either (a) for the furnishing of transportation services through the assignment of motor vehicles for a continuing period of time to the exclusive use of each person served or (b) for the furnishing of transportation services designed to meet the distinct need of each individual customer."

Section 209(b) [6] covers the issuance of permits to contract carriers and was amended in 1957 by the addition of the following:

"In determining whether issuance of a permit will be consistent with the public interest and the national transportation policy declared in this Act, the Commission shall consider the number of shippers to be served by the applicant, the nature of the service proposed, the effect which granting the permit would have upon the services of the protesting carriers and the effect which denying the permit would have upon the applicant and/or its shipper and the changing character of that shipper's requirements."

These 1957 amendments were reviewed by the Supreme Court in Interstate Commerce Commission v. J–T Transport Co., Inc., 368 U.S. 81, 82 S.Ct. 204, 7 L.Ed.2d 147. In that case J–T sought contract-carrier authorization for certain aircraft parts, and common carriers protested asserting their ability to meet the shipper's needs.[7] The examiner recommended the grant of the permit but the

Commission denied it saying that the applicant had not shown the existing service of the other carrier to be inadequate. The Supreme Court held against the Commission saying that the standard is not whether existing services are "reasonably adequate" but whether a shipper has a "distinct need" for a different or more select or more specialized service, and that: "The protesting carriers must show they can fill that 'distinct need,' not that they can provide a 'reasonably adequate service.'"[8]

The J–T case is not decisive of the issue here presented because in J–T no question was raised as to the transportation nature of the services and the Court was not required to decide whether the Commission could consider nontransportation services.

To support its order now under consideration the Commission relies heavily on two provisions of the 1957 amendments. It points out that under the § 203(a) (15) definition a contract carrier is a person who engages in interstate transportation of persons or property for compensation under continuing contracts "for the furnishing of transportation services designed to meet the distinct need of each individual customer." Emphasis is placed on the term "distinct need" without differentiating between a distinct transportation need and a distinct need which is unrelated to transportation.

The language is plain and unambiguous. The contracts are to furnish transportation services. Such services, and only such services, are to meet the distinct needs of the customers. The reference to transportation services restricts and limits the language which follows.

The Commission also relies on the second criterion appearing in § 209(b),

6. 49 U.S.C. § 309(b).

7. The J–T decision involved two separate contract-carrier applications. One Reddish sought a contract-carrier permit on the ground that he could better serve customers who ordered less-than-truckload amounts. The Commission refused

to follow the recommendation of the examiner and denied the permit for reasons similar to those in the J-T case. The Supreme Court similarly held that the Commission was in error.

8. 368 U.S. 91, 82 S.Ct. 210, 7 L.Ed.2d 147.

which says that in determining the right of a contract carrier to a permit, the Commission shall consider "the nature of the service proposed." This is said to require consideration of the nature of the service as related to the distinct needs of the customer. If we are correct in our interpretation of § 203(a) (15) that the needs referred to are transportation needs, the error of the Commission is apparent.

The context of § 209(b) supports our view. Before setting forth the criteria which shall be considered, the statute says that a contract-carrier permit may be issued if, among other things, "the proposed operation * * * will be consistent with the public interest and the national transportation policy declared in this Act." [9] As we read the declaration of national transportation policy it is confined to transportation services. Further, the jurisdiction of the Commission under Part II of the Interstate Commerce Act (Motor Carrier Act) is stated thus in § 202(a) of the Act: [10]

"The provisions of this chapter apply to the transportation of passengers or property by motor carriers engaged in interstate or foreign commerce and to the procurement of and the provisions of facilities for such transportation, and the regulation of such transportation, and of the procurement thereof, and the provision of facilities therefor,

is vested in the Interstate Commerce Commission."

The parties all find comfort in Commission decisions antedating the 1957 amendments. The scales are about equally weighted. None of the selected Commission orders were subjected to court review. We deem it unnecessary to choose between the variety of decisions, all of which seem to have been made on an ad hoc basis. In the J–T decision, and in reference to the 1957 amendments here under consideration, the Supreme Court said: [11]

"We cannot assume that Congress, in amending the statute, intended to adopt the administrative construction which prevailed prior to the amendment."

The references made to the legislative history are not helpful. We find nothing specifically pertaining to the issue before us. The Senate Report [12] emphasized the inadequacy of the existing law "to maintain proper distinctions between common and contract carriage," and concluded thus:

"Your committee is of the opinion that the public interest in a sound transportation system, and particularly in a stable and adequate system of common carriage, in the light of the objectives of the national transportation policy, require that the bill, as amended, be passed."

---

9. The national transportation policy, as declared in the Act, 49 U.S.C. preceding § 301 reads: "It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act [chapters 1, 8, 12, 13 and 19 of this title], so administered as to recognize and preserve the inherent advantages of each; to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices; to

cooperate with the several States and the duly authorized officials thereof; and to encourage fair wages and equitable working conditions;—all to the end of developing, coordinating and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense. All of the provisions of this Act shall be administered and enforced with a view to carrying out the above declaration of policy."

10. 49 U.S.C. § 302(a).

11. 368 U.S. 89, 82 S.Ct. 209, 7 L.Ed.2d 147.

12. U.S.Cong.News '57, pp. 1604, 1605.

The continued emphasis of the Senate Report is on transportation with an intent to protect common carriers and retain the advantages of the contract carriers. We find nothing to indicate that Congress meant to give contract carriers the advantages which would ensue from furnishing nontransportation services.

The needs of shippers are varied and diversified. Some of these needs relate to transportation and some do not. The property transported has to be readied for use or sale. Activities pertaining to sale are beyond the scope of transportation. Activities pertaining to use may or may not be within the realm of transportation. The picking up and packing of household goods at the point of origin and their placement in position for use at destination have overtones of transportation. On the other hand the servicing of automobiles after delivery from the factory to a local dealer would seem to be divorced from transportation. Difficulty in drawing the line does not justify rejection of the statutory standard.

The Commission report here under attack does not distinguish between transportation and nontransportation needs of the shippers. We are of the opinion that the statute requires that the distinction be made and that before the Commission may give weight to the shippers' distinct needs it must first determine that those needs pertain to a transportation service. In the case under consideration it made no such determination. We decline to make the determination in advance of Commission action. The delineation of what are transportation services is particularly within the competence and expertise of the Commission. The Commission should make the determination in the first instance and its decision then may be reviewed by the courts.

The order of the Commission is set aside and the case is remanded for further action by the Commission in accordance with the views herein expressed.

This opinion sufficiently states the findings of fact and conclusions of law of the court. Further findings of fact and conclusions of law are not necessary. The clerk will enter an appropriate judgment.

BOHANON, District Judge (dissenting).

I feel compelled to dissent from the views expressed in the majority opinion.

The facts as stated, and the applicable statutes, are as set forth in the majority opinion.

I feel that the specialized services offered to be rendered by the Petitioner to the supporting shippers are services so closely connected with, and particularly suited to meet the transportation needs of the supporting shippers that these services should be considered as an incident to "furnishing of transportation services * * * designed to meet the distinct need of each individual customer." It is my view that the transportation services and the attendant services offered by the applicant come within the purview and meaning of Section 203(a) (15) of the Interstate Commerce Act, and the majority view, in my opinion, is unduly restrictive.

I adopt as a part of this Opinion the Report of the Commission, in No. MC–124190, Interstate Commerce Commission-Griffin Mobile Home Transporting Company, contract carrier application, reported and published at 91 M.C.C. 801. I think the language used by Commissioner Tucker at page 804 of the Report is particularly apt, where he said:

"We would be closing our eyes to the realities of the situation if we were to refuse to consider the total requirement of a shipper supporting a contract carrier's application. To do so would be to deprive the shipper of the complete, personalized services which it needs, thus, in all likelihood forcing it to initiate or continue a proprietary trucking operation; a form of motor transportation which contract carriage ought to be free, completely and satisfactorily, to replace."

I would, therefore, affirm the Report and Decision of the Interstate Commerce Commission.